## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SABRINA DE SOUSA,<br><br>Plaintiff,<br><br>v.<br><br>CENTRAL INTELLIGENCE AGENCY *et al.*,<br><br>Defendants. | Civil Action No. 14-1951 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Sabrina De Sousa, brings this action against the U.S. Central Intelligence Agency, the U.S. State Department, and the U.S. Department of Defense, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act ("PA"), 5 U.S.C. § 552a, challenging various aspects of the defendants' responses to the plaintiff's six FOIA requests. Pending before the Court are the defendants' motion for summary judgment and the plaintiff's cross-motion for summary judgment. *See generally* Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 22; Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-MSJ"), ECF No. 25. For the reasons set out below, the defendants' motion is granted in part and denied in part, and the plaintiff's motion is denied.

## I.      BACKGROUND

The plaintiff served as a Foreign Service Officer for the U.S. State Department from 1998 to 2009. *See De Sousa v. Dep't of State (De Sousa I)*, 840 F. Supp. 2d 92, 96 (D.D.C. 2012). News reports indicate that, on February 17, 2003, while the plaintiff was stationed at the U.S. Consulate in Milan, U.S. and Italian intelligence agents kidnapped an Islamic cleric and suspected terrorist, Hassan Mustafa Osama Nasr, also known as "Abu Omar," in Milan and flew

him to Egypt to be interrogated and tortured, an act known as an "extraordinary rendition."  *Id.*

Although the plaintiff maintains that she was vacationing at a ski resort approximately 130 miles

outside Milan when the alleged rendition occurred, Compl. ¶ 11, ECF No. 1, she was ultimately

convicted in connection with the rendition *in absentia*, *id.* ¶ 37, after unsuccessfully imploring

the U.S. government to assert diplomatic or consular immunity on her behalf, *id.* ¶¶ 23–27, 31.

Thereafter, the plaintiff sued the CIA and the State Department alleging that their failure to assert

immunity on her behalf violated her constitutional rights.  *See generally De Sousa I*, 840 F.

Supp. 2d 92 (holding, *inter alia*, that the plaintiff's entitlement *vel non* to diplomatic or consular

immunity is a non-justiciable political question).  Seeking additional information as to the

government's decision not to assert immunity on her behalf, the plaintiff filed six FOIA requests

with the CIA, State Department, and Department of Defense.  These FOIA requests, and the

government's responses, are described below.[1]

### A.      The Plaintiff's FOIA Requests to the CIA

The plaintiff filed two FOIA requests with the CIA seeking a total of fourteen separate

categories of records or information.  First, on May 8, 2014, the plaintiff requested records

discussing the CIA's consideration of reactive steps to the Italian prosecution and trial of U.S.

citizens who had allegedly participated in the rendition, including the following ten categories of

records: (1) "whether or not to take steps to defend or protect [the plaintiff] (including but not

limited to invoking immunity) against the charges that [she] participated in the

rendition/kidnapping . . . of Abu Omar;" (2) "whether or not to take steps to defend or protect

any other individual (including but not limited to invoking immunity) charged with participation

---

[1]      A more fulsome exposition of the plaintiff's allegations regarding the rendition and its aftermath is
presented in *De Sousa I*.  These allegations are less pertinent in this action, which is limited to the adequacy of the
responses to the plaintiff's FOIA requests for information from the CIA, State Department, and Department of
Defense.

in the rendition;" (3) "whether or not to allow the trial of 26 U.S. citizens to proceed to convictions on charges of participating in the rendition;" and (4) "authorization for the rendition." Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶¶ 1–2, ECF No. 22-6. The request further sought records involving communications between CIA officials and (5) "Department of Justice representative(s) at the U.S. Embassy in Rome, mentioning or referring to the charges or trial of 26 U.S. citizens accused of participating in the rendition/kidnapping," (6) "officials at the U.S. Department of State (including . . . those at the U.S. Embassies in Cairo and Rome) mentioning or referring to the rendition," (7) "officials at the U.S. Department of Defense mentioning or referring to the rendition;" and (8) "members of Congress or their staff mentioning or discussing whether or not to take steps to defend or protect (including but not limited to invoking immunity) any of the 26 U.S. citizens accused of participating in the rendition." *Id.* Finally, the request sought records (9) "mentioning whether or not the CIA Office of the Inspector General can or should investigate the rendition," as well as any (10) "[r]eports or other results from the Accountability Review Board on accountability for those responsible for the rendition." *See id.* In response to the plaintiff's first request, the CIA issued a *Glomar* response, stating that "the CIA can neither confirm nor deny the existence or nonexistence of records responsive to [the] request." *Id.* ¶ 3.[2]

The plaintiff's second request to the CIA, dated September 3, 2014, *id.* ¶ 4, sought an additional four categories of records concerning whether to seek clemency on behalf of the plaintiff and others in connection with the rendition convictions, *id.* ¶ 5. In particular, the request asked for records involving communications between CIA officials and (11) Avv. Fabio

---

[2]     "The name ['*Glomar* response'] is derived from the facts of *Phillippi v. CIA*, in which [the D.C. Circuit] addressed the CIA's refusal to confirm or deny whether it had documents relating to Howard Hughes' ship, the Glomar Explorer, which had reputedly been used in an attempt to recover a lost Soviet submarine." *ACLU v. CIA*, 710 F.3d 422, 426 n.1 (D.C. Cir. 2013) (citing 546 F.2d 1009 (D.C. Cir. 1976)).

Cagnola, an Italian defense attorney, and (12) the office of the President of Italy that mention "clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case," as well as any other records that (13) mention clemency for the individuals convicted of participating in the rendition. *Id.* ¶ 5. The request also sought any records (14) mentioning the plaintiff's July 2, 2014 letter to Avv. Cagnola, Hon. John R. Phillips, Kathleen A. Doherty, and William Nardini regarding "clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case." *Id.* The CIA acknowledged receipt of the request on February 11, 2015. *Id.* ¶ 6.

### B.     The Plaintiff's FOIA Requests to the State Department

The plaintiff also filed two FOIA requests with the State Department. On May 8, 2014, the plaintiff requested four categories of records, including those: (1) "[c]ommunications constituting or mentioning the Secretary of State's concurrence in 2002 or 2003 for authorization to proceed with the rendition/kidnapping of Abu Omar;" (2) "discussing whether or not to take steps to defend or protect [the plaintiff] (including but not limited to invoking immunity) against the charges that [the plaintiff] participated in the rendition/kidnapping of Abu Omar;" (3) "discussing whether or not to take steps to defend any other individual (including but not limited to invoking immunity) charged with participation in the rendition/kidnapping of Abu Omar;" and (4) "discussing or mentioning the letters [the plaintiff] sent to the Secretaries of State and the Assistant Secretary of State for Democracy, Human Rights, and Labor requesting immunity and an investigation into allegations of torture of Abu Omar." *Id.* ¶ 12. The State Department acknowledged the request by letter, dated May 28, 2014. *Id.* ¶ 13.

The plaintiff submitted a second request to the State Department on September 3, 2014, seeking six categories of records, including those (1) "[c]onstituting or reflecting

communications between [State Department] officials and Avv. Fabio Cagnola which mention, discuss, or refer to clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case;" (2) "[c]onstituting or reflecting communications between CIA officials and the office of the President of Italy which mention, discuss, or refer to clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case;" (3) "[m]entioning, discussing, or referring to clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case;" (4) "[m]entioning, discussing, or referring to [the plaintiff's] July 2, 2014 letter to Avv. Fabio Cagnola, Hon. John R. Phillips, Kathleen A. Doherty, and William Nardini regarding clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case;" (5) "[c]onstituting or reflecting communications by or to [State Department] officials . . . requesting the assistance of Avv. Cagnola in file [sic] clemency action on behalf of all 25 of the remaining convicted CIA officers;" and (6) "[c]onstituting or reflecting communications between the U.S. Embassy and Avv. Cagnola which mention, discuss, or refer to obtaining approval to proceed on the convicted CIA officers' behalf, payment of Avv. Cagnola's fees, or which CIA officers' behalf clemency will be sought." *Id.* ¶ 14.  The State Department acknowledged the request by letter, dated April 13, 2015. *Id.* ¶ 15.

>C.    **The Plaintiff's FOIA Requests to the Department of Defense**

The plaintiff submitted a FOIA request to the Department of Defense, also on May 8, 2014, *id.* ¶ 7, seeking records "discussing whether or not to assert the Status of Forces Agreement for any individual charged with participation in the rendition/kidnapping of Abu Omar" and records "discussing pardons or potential pardons for individuals convicted of participation in the rendition/kidnapping of Abu Omar, for the period of 2009–2013," *id.* ¶ 8. The Department of Defense notified the plaintiff that it had received this request by email on

May 29, 2014.  *Id.* ¶ 9.  On June 4, 2014, the plaintiff filed an identical request with the United

States Air Force, a component of the Department of Defense, which acknowledged the request

by letter, dated June 9, 2014.  *Id.* ¶¶ 10–11.

> **D.  The Plaintiff's Instant Claims, and the Government's Document Production**

Unsatisfied by the responses to her FOIA requests, the plaintiff filed this lawsuit on

November 19, 2014.  *Id.* ¶ 16.  While the CIA indicated an intent to assert a *Glomar* response to

the plaintiff's requests, *see* Explanation for Parties' Failure to Comply with Standing Order and

Joint Status Report at 3, ECF No. 13, the State Department advised that it planned to assert a

partial *Glomar* response and was otherwise searching for responsive records.  *Id.* at 2–3.  The

Department of Defense likewise undertook searches for responsive records.  *Id.* at 2.  The State

Department ultimately released 18 documents in full and 61 documents in part, and withheld 17

documents in full.  *See* Decl. of Eric F. Stein, Acting Co-Director of the Office of Information

Programs and Services, Department of State ("First Stein Decl.") ¶ 75, ECF No. 23-1.  The

Department of Defense produced 74 documents totaling 286 pages.  Decl. of Mark H.

Herrington, Associate Deputy General Counsel, Department of Defense ("First Herrington

Decl.") ¶¶ 4–5, ECF No. 22-3.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "In FOIA cases, 'summary

judgment may be granted on the basis of agency affidavits if they contain reasonable specificity

of detail rather than merely conclusory statements, and if they are not called into question by

contradictory evidence in the record or by evidence of agency bad faith.'"  *Judicial Watch, Inc.*

*v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)).  Indeed, the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary judgment," *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request," *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).  Reflecting the necessary balance between the public's interest in governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010), the FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice (CREW)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *Niagra Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18

(D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (holding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld, to enable the court to fulfill its duty of ruling on the applicability of the exemption, and to enable the adversary system to operate by giving the requester as much information as possible, on the basis of which the requester's case may be presented to the trial court.[3] *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d at 215 (noting that "summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." (internal quotation marks and alteration omitted)); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir.

---

[3]    "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision."); *CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting an affidavit that "'describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith'" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))). While "an agency's task is not herculean[ ]" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson*, 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862.

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B), and "directs district courts to determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption," *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).

Moreover, district courts also have an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information.  *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the segregability issue *sua sponte*") (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *Stolt–Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.") (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans–Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III.   DISCUSSION

The plaintiff challenges four aspects of the defendants' production: (1) the CIA's comprehensive *Glomar* response, (2) the State Department's partial *Glomar* response, (3) the Department of Defense's decision to withhold a record titled Cole 61-62, and (4) the State Department and Department of Defense's release of all segregable non-exempt material.  *See generally* Pl.'s Reply Supp. Pl.'s Cross-MSJ ("Pl.'s Reply"), ECF No. 29.  The parties have cross-moved for summary judgment as to these four issues.  The contested aspects of the defendants' responses to the plaintiff's FOIA requests are discussed *seriatim*.[4]

---

[4]     The plaintiff brings this suit under both the Freedom of Information Act and the Privacy Act and, in turn, the defendants rely on Privacy Act exemptions to justify their responses to the plaintiff's requests.  Consideration of the FOIA exemptions relied upon by the defendants are sufficient to resolve the pending motions and, consequently, the parties' arguments premised on the Privacy Act need not be addressed.

A.      The CIA's *Glomar* Response

The CIA argues that its comprehensive *Glomar* response is proper under FOIA

Exemption 1, as acknowledging the existence or non-existence of responsive records would

reveal classified information, 5 U.S.C. § 552(b)(1), and under Exemption 3, as the fact whether

responsive documents exist or not is "specifically exempted from disclosure by statute," 5 U.S.C.

§ 552(b)(3).  *See* Defs.' Mem. Supp. MSJ ("Defs.' Mem.") at 11, ECF No. 22.[5]  The plaintiff

counters that the neither Exemption 1 nor Exemption 3 justifies the CIA's *Glomar* response, Pl.'s

Mem. Opp'n Defs.' MSJ & Support Cross-MSJ ("Pl.'s Opp'n") at 6–8, ECF No. 25, and, in the

alternative, to the extent that the *Glomar* response is intended to avoid CIA's acknowledgement

of any relationship with the plaintiff, such fact has already been "officially acknowledged" by

the CIA, *id.* at 9–10.  The standards governing *Glomar* responses are discussed before analyzing

the application of FOIA Exemption 1 here.

1.      *Glomar* **Responses Generally**

"In certain cases, merely acknowledging the existence of responsive records would itself

'cause harm cognizable under [a] FOIA exception.'"  *People for the Ethical Treatment of*

*Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Wolf v. CIA*, 473

F.3d 370, 374 (D.C. Cir. 2007)).  In such cases, "an agency can issue a *Glomar* response,

refusing to confirm or deny its possession of responsive documents."  *Id.*  "A *Glomar* response is

valid 'if the fact of the existence or nonexistence of agency records falls within a FOIA

exemption.'"  *Id.* (quoting *Wolf*, 473 F.3d at 374).  To determine whether acknowledging the

existence or non-existence of responsive records "fits a FOIA exemption, courts apply the

general exemption review standards established in non-*Glomar* cases."  *Wolf*, 473 F.3d at 374;

---

[5]      The CIA also relies on PA Exemptions (k)(1) and (j)(1).  *See supra* n.4.

*accord ACLU v. CIA*, 710 F.3d at 426.  Thus, the agency bears the burden of showing that the fact of whether it possesses requested records is protected from disclosure under a FOIA exemption.  *See Wolf*, 473 F.3d at 374

A *Glomar* response may be challenged in two related ways.  First, a plaintiff may challenge the agency's assertion of an exemption, that is, whether confirming or denying the existence of requested records would result in "harm cognizable under [a] FOIA exception." *Wolf*, 473 F.3d at 374 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)); *see also, e.g.*, *People for the Ethical Treatment of Animals*, 745 F.3d at 540.  Second, the plaintiff may argue that the agency has already "officially acknowledged" the existence of a responsive record. *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1999)); *see also, e.g.*, *ACLU v. CIA*, 710 F.3d at 427 ("[T]he plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect.").  The plaintiff employs both of these methods to challenge the CIA's *Glomar* response here.

## 2.    The CIA's *Glomar* Response Pursuant to FOIA Exemption 1

Under Exemption 1, an agency may refuse to produce materials that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  The CIA relies on § 3.6(a) of Executive Order 13,526 ("E.O. 13,526"), 75 Fed. Reg. 707 (Dec. 29, 2009), which provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their

existence or nonexistence is itself classified under [Executive Order 13526] or its predecessors." *Id.* § 3.6(a).

To establish the propriety of its *Glomar* response, the CIA submitted a 24-page declaration prepared by the Information Review Officer for the CIA's Litigation Information Review Office. *See* First Decl. of Antoinette B. Shiner, Information Review Officer ("First Shiner Decl.") ¶ 1, ECF No. 22-1. The CIA's declarant explains that the existence or nonexistence of records responsive to the plaintiff's requests is "a currently and properly classified fact that concerns 'intelligence activities' and 'intelligence sources and methods' under section 1.4(c) of the Executive Order and 'foreign relations or foreign activities of the United States' under section 1.4(d) of the Order." *Id.* ¶ 27; *see also id.* ¶¶ 29–40. The CIA has identified the following three classified facts that would be revealed if the CIA were to confirm or deny the existence of records responsive to the plaintiff's two FOIA requests: (1) "whether the CIA had an intelligence interest in Abu Omar and/or his alleged rendition/kidnapping;" (2) "whether or not the CIA was involved in the alleged rendition operation in Milan;" and (3) "whether or not the CIA had a relationship with the Plaintiff." *Id.* ¶ 23. In the plaintiff's view, the CIA's *Glomar* response pursuant to Exemption 1 is untenable for three reasons, each of which is ultimately unavailing.

First, the plaintiff takes issue with the level of detail in the first declaration submitted by the CIA for failing to specify which *Glomar* facts would be revealed for each of the fourteen categories of records the plaintiff had identified in her two requests to the CIA (ten categories of documents in the first FOIA request and four in the second). *See* Pl.'s Opp'n at 6 ("Assuming *arguendo* for the moment that these three Glomar facts are properly classified, the problem is that the CIA lumps together the 14 categories of records requested by Plaintiff in her two FOIA

requests. The CIA does not explain how each category of records requested by Plaintiff would reveal one or more of these three Glomar facts."). To better understand the contours of the CIA's *Glomar* response with the plaintiff's well-placed objection, the CIA was directed to "clarify . . . its generally stated position about the appropriateness of a *Glomar* response by . . . specifying for each individual category of records sought in each FOIA/PA request to the CIA . . . at issue in this lawsuit what fact protected by a *Glomar* response would be revealed were the agency to confirm or deny the existence of responsive records, with additional declarations as necessary." Minute Order (dated Jan. 12, 2017). In response, the CIA filed a supplemental declaration, which includes a chart indicating which of the three *Glomar* facts identified in the original declaration would be revealed with a response to each category of records listed in the plaintiff's first and second FOIA requests. *See* Second Decl. of Antoinette Shiner, Information and Review Officer ("Second Shiner Decl.") ¶ 3, ECF No. 32-1. The chart also refines the third *Glomar* fact listed in the original declaration to be "whether or not the CIA had a relationship with the Plaintiff (*or any of the other U.S. citizens charged and convicted in the Milan rendition case*)." *Id.* (emphasis added). The chart indicates that confirming or denying the existence of documents responsive to nine of the fourteen categories of requested records would reveal all three *Glomar* facts. *See id.* Acknowledging records responsive to the remaining five categories of requested records would reveal two of the three *Glomar* facts, *i.e.*, "whether or not the CIA had an intelligence interest in Abu Omar and/or his alleged rendition/kidnapping" and "whether or not the CIA was involved in the alleged rendition operation in Milan." *Id.* Thus, with its supplemental declaration, the CIA has adequately addressed the plaintiff's first objection to the *Glomar* response.

The plaintiff's second contention is that the CIA has not explained how twelve of the fourteen categories of records "requested by Plaintiff would reveal one or more of the[] three Glomar facts."  Pl.'s Opp'n at 6–7.[6]  Eight categories of documents requested in the plaintiff's first FOIA request focus on records discussing whether to take steps to defend or protect the plaintiff or anyone else in connection with the rendition, as well as communications between CIA officials and other governmental officials about the rendition.  The plaintiff argues that confirming or denying the existence of responsive records "would reveal, at most" that the CIA was "interest[ed]" in and "discussing" "*allegations*" that it was involved in the rendition, rather than confirming the actual *Glomar* fact.  *Id.* at 7–8 (emphasis in original).  Likewise, for the plaintiff's second FOIA request, which sought four categories of records concerning "clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition," the plaintiff argues that "the existence or nonexistence of records discussing requests for 'clemency' for the individuals convicted would not reveal any Glomar fact" because "[c]lemency is a matter of grace, and disclosure of the existence of records would not reveal whether or not clemency was or could have been sought, nor would it reveal anything about the allegations underlying the convictions."  *Id.* at 8.  In other words, the plaintiff does not contest that the three cited *Glomar* facts are properly classified but instead argues that confirming or denying the existence of responsive records discussing mere allegations or possible clemency would not actually be probative of whether the CIA has an interest in Abu Omar, whether the CIA was involved in the rendition, or whether the CIA has a relationship with the plaintiff or the other individuals

---

[6]     To be precise, the plaintiff concedes that acknowledging the existence or nonexistence of records responsive to record categories 4 and 10 in her first FOIA request, *i.e.*, records "[d]iscussing or constituting authorization for the rendition/kidnapping of Abu-Omar" as well as "[r]eports or other results of the Accountability Review Board on accountability for those who were responsible for the rendition/kidnapping or Abu Omar," would reveal a *Glomar* fact.  *See* Pl.'s Opp'n at 8 n.3.

convicted in connection with the rendition.  The CIA, for its part, argues that "an agency's interest in 'allegations' cannot be separated from the agency's interest in an underlying event," Defs.' Combined Opp'n Pl.'s Cross-MSJ Reply Supp. Defs.' MSJ ("Defs.' Opp'n) at 2, ECF No. 27,  and that each category of requested records "presume[s] CIA involvement" in the rendition, which is itself classified, Defs.' Mem. at 13.

In arguing that the CIA's *Glomar* response was improper as to her first FOIA request, the plaintiff emphasizes the wording of her requests, stating that her "requests are generally written in such a way that admitting the existence or non-existence of responsive records would not disclose any Glomar fact." *See* Pl.'s Opp'n at 7, ECF No. 25.  By way of example, the plaintiff notes that "Item 2 of [her] first request to the CIA seeks records '[d]iscussing whether or not to take steps to defend or protect any other individual (including but not limited to invoking immunity) charged with participation in the rendition/kidnapping of Abu Omar.'"  *Id.* (brackets in original).  The plaintiff contends that "[d]isclosing the existence or non-existence of [such] records would not reveal whether the CIA had an intelligence interest in Abu Omar's kidnapping; it would reveal, at most, that the CIA had some type of interest in *allegations* that it was involved in the kidnapping."  *Id.* at 7–8 (emphasis in original).  Similarly, according to the plaintiff, acknowledging the existence *vel non* of records responsive to category 2 in her first FOIA request "would not reveal whether the CIA was involved in the rendition; it would reveal, at most, that the CIA was discussing *allegations* that it was involved in the rendition."  *Id.* at 8 (emphasis in original).  With respect to the third asserted *Glomar* fact, the plaintiff contends that "because the request is written in the disjunctive ('whether *or not* to take steps to defend or protect') . . . , disclosure of the existence of responsive records would not reveal whether Plaintiff was affiliated with the CIA; it would reveal no more than that the CIA discussed

whether *or not* to take action to protect or defend individuals *alleged* to be working for the CIA."
*Id.* at 7–8.

The plaintiff's argument is unpersuasive.  As the CIA points out, the agency would likely have records "[d]iscussing whether or not to take steps to defend or protect any other individual . . . charged with participation in the rendition/kidnapping of Abu Omar" only if a CIA agent had been involved in the alleged rendition.  At the very least, the existence of records would show an intelligence interest in Abu Omar.  Conversely, if no CIA agent were involved in the rendition, then the CIA likely would not have records addressing whether to "defend or protect" any individual charged in connection with the rendition.  *See* First Shiner Decl. ¶ 23.  Given that whether the CIA has interest in Abu Omar, and whether it was involved in the rendition are indisputedly properly classified facts, confirming or denying the existence of documents responsive to the second category of records identified in her first FOIA request would disclose classified facts.[7]  As the plaintiff observes, "similar analysis" applies to the other categories of records sought in the plaintiff's first FOIA request.  Pl.'s Opp'n at 8.  Accordingly, the CIA's *Glomar* response as to the plaintiff's first FOIA request was proper.

The CIA's *Glomar* response to the plaintiff's second FOIA request, which sought "communications between CIA officials" and others that "mention, discuss, or refer to clemency for the CIA officers (including myself) convicted in the Milan rendition case," Defs.' SMF ¶ 5, was also proper.  Critically, categories 1 through 3 specifically reference "clemency for the CIA

---

[7]     Equally unavailing is the plaintiff's argument that because her request for records is written in the disjunctive, *i.e.*, "whether or not to take steps," a response from the CIA would not indicate whether the plaintiff had a relationship with the agency.  Presumably, the plaintiff is referring to the first category of records requested in her first FOIA request since this first category seeks records pertaining specifically to the plaintiff.  *See* Defs.' SMF ¶ 2 (noting that the first category of records requested were those records "[d]iscussing whether or not to take steps to defend or protect [the plaintiff] (including but not limited to invoking immunity) against the charges that [the plaintiff] participated in the rendition/kidnapping").  The plaintiff's emphasis on the disjunctive form of the request ignores the main thrust of the request regarding the agency's defense or protection of the plaintiff.  If she had no affiliation with the CIA at all, the CIA would not be discussing whether to defend her, or not to defend her.

officers (including [the plaintiff]) convicted in the Milan rendition case." These requests are phrased in a manner that presumes the plaintiff's affiliation with the CIA as well as the CIA's affiliation with "others" who were "convicted in the Milan rendition case." Accordingly, the CIA's *Glomar* response to the first three categories of records listed in the plaintiff's second FOIA request was justified.[8] *See Klayman v. CIA*, 170 F. Supp. 3d 114, 120–21 (D.D.C. 2016) (upholding a *Glomar* response because, if the CIA were to confirm or deny the existence of records responsive to the plaintiff's FOIA request, "it would reveal whether [a particular individual] was [a CIA] covert contractor[] or employee[]").

The fourth category of records requested in the plaintiff's second FOIA request are those records "[m]entioning, discussing, or referring to [the plaintiff's] July 2, 2014 letter to Avv. Fabio Cagnola, Hon. John R. Phillips, Kathleen A. Doherty, and William Nardini regarding clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case." Defs.' SMF ¶ 5. The plaintiff's letter at issue expresses appreciation to an Italian lawyer, Avv. Cagnola, for contacting the plaintiff about "the US Embassy's planned action for clemency for those remaining convicted US officers associated with the Milan Rendition case." Compl., Ex. D ("Letter from Pl. to Avv. Cagnola") at 1, ECF No. 1-4. The lawyer had evidently been retained by the U.S. government "to file a clemency action on behalf of all 25 of the remaining convicted officers." *Id.* The plaintiff indicates in the letter that she was surprised that the government had not contacted her about this "welcome action," *id.* and asked "to be included in the US Embassy's request for clemency along with the other convicted officers," *id.* at 2. Finally, the plaintiff asked Avv. Cagnola to "clarify whether the US Embassy requested that [he]

---

[8]        The CIA's *Glomar* response as to these three categories of records was proper so long as at least one *Glomar* fact is implicated and, consequently, the other two *Glomar* facts need not be addressed. As explained, embedded in these requests is the assumption that the plaintiff and the others convicted in connection with the rendition were affiliated with the CIA. The plaintiff does not dispute that this is a classified fact.

contact each of the 25 officers *directly*[] to obtain approval to proceed on their behalf." *Id.* (emphasis in original).

The plaintiff argues that her request for records concerning the letter "is even one step further removed" than the other categories of records listed in her second FOIA request because "[c]onfirming that responsive records exist would reveal nothing about whether those records were a mailroom log of letters received, or a high-ranking official's candid discussion about how to respond to the memorandum."  Pl.'s Opp'n at 8.  The CIA responds that "[a]cknowledging the existence or non-existence of records indicating internal discussions about a letter regarding clemency would . . . directly link (if their existence was confirmed) or disassociate (if denied) the agency to the alleged rendition, and ultimately to Plaintiff, who sent the letter."  Defs.' Opp'n at 3–4.

The letter was not addressed to the CIA but instead to Avv. Cagnola, with copies to The Honorable John R. Phillips, the ambassador to Italy; Kathleen A. Doherty, an employee of the State Department at the U.S. Embassy in Rome; and William Nardini, an employee of the Justice Department at the U.S. Embassy in Rome.  *See* Letter from Pl. to Avv. Cagnola 1.  Thus, the CIA's possession of records concerning the letter—even simply a "mailroom log" noting receipt of the letter—would suggest that the letter was forwarded to the CIA and potentially discussed more thoroughly within the CIA or with other agencies.  This, in turn, would lead to the reasonable inference that the CIA had either a relationship with the plaintiff, an intelligence interest in Abu Omar, or some other involvement in the rendition.  Conversely, were the CIA to possess no records concerning the letter, the reasonable inferences would be that the CIA had no relationship with the plaintiff, no intelligence interest in Abu Omar, and no involvement in the rendition.  Each of these facts is classified.  *See* First Shiner Decl. ¶ 23.  Thus, the CIA's

*Glomar* response to the fourth category of records listed in the plaintiff's second FOIA request was proper.

The plaintiff's third and final contention, however, is that the CIA has "officially acknowledged" its relationship with the plaintiff, in writing, and, therefore, may no longer use a *Glomar* answer in responding to the plaintiff's FOIA requests.[9]  Such claims of official disclosure are subject to a rigorous test originally laid out in *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990), requiring that: "'(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure,'" *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d at 620–21).  The Court need not reach this issue because, assuming *arguendo* that the plaintiff has shown the CIA's official

---

[9]  In particular, the plaintiff points to correspondence between her then-attorney and the CIA's Office of the General Counsel.  In a letter dated August 4, 2008, to the CIA's National Clandestine Service, the plaintiff's then-attorney "raised several issues about the travel restrictions the CIA had imposed on Ms. De Dousa."  Pl.'s Opp'n at 9.  On September 24, 2008, the CIA sent a letter to the plaintiff's then-attorney stating, *inter alia*, that "the CIA is authorized to regulate the conduct of its employees, which includes the authority to impose operational, security, and counterintelligence requirements on its employees as a condition of their continued employment."  Pl.'s Opp'n, Ex. 2 ("Letter from John McPherson to Jonathan Rose") at 1, ECF No. 24-2.  The CIA letter bears no classification marks, but also does not refer to the plaintiff by name, instead referring to Mr. Rose's "client."  *Id.*  The plaintiff also cites a second letter, dated October 28, 2008, from the Director of National Intelligence, who oversees the Director of the CIA, to the plaintiff's then-attorney.  *See generally* Pl.'s Opp'n, Ex. 3 ("Letter from Ronald Burgess to Jonathan Rose"), ECF No. 24-3.  The letter is marked "unclassified" and states, "your client has been and continues to be invited to regular meetings at the Central Intelligence Agency (CIA) for updates regarding this matter."  *Id.* at 1.  Finally, the plaintiff notes that "[e]ven after [she] resigned from her position with the federal government in February 2009," CIA officials "continued to discuss with [the plaintiff] her former affiliation with the agency in unclassified emails."  Pl.'s Opp'n at 10 (citing *id.*, Ex. 4 ("Email to Sabrina De Sousa"), ECF No. 24-4).  In light of this correspondence, the plaintiff argues that "it is neither 'logical' nor 'plausible' that disclosure of [the plaintiff's] association with the CIA would reveal something which had not previously been official disclosed."  *Id.*  In response to the plaintiff's "official acknowledgment" argument, the CIA argues that the plaintiff has not met the "demanding test" for establishing official acknowledgment since the correspondence cited was private, not public; made no reference to any of the *Glomar* facts at issue in this case; and, regardless, "courts have concluded that [private correspondence] definitively do[es] not amount to [an] official disclosure[]."  Defs.' Opp'n at 4–6 (citing *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009)).  To the extent that the plaintiff posits that any such private correspondence from the CIA to any of its clandestine operatives, such as pay stub, travel voucher, or other form of common employment documentation, amounts to an official, public acknowledgment of the CIA's relationship with that operative, this position is untenable and falls far short of the exacting test applied to find an official disclosure.

acknowledgement of its affiliation with the plaintiff, the CIA's *Glomar* response was still proper given that each category of records sought by the plaintiff implicates another *Glomar* fact.  To be clear, the CIA's *Glomar* response to the eight disputed categories of records requested in the plaintiff's first FOIA request is justified based on all three *Glomar* facts; the *Glomar* response to the first three categories of records requested in the second FOIA request is justified at least based on the third *Glomar* fact, which includes not only the plaintiff's affiliation *vel non* with the CIA, but also whether the other U.S. citizens allegedly involved in the rendition had a relationship with the CIA; and the *Glomar* response as to the fourth category of records requested in the plaintiff's second FOIA request implicates all three *Glomar* facts.

***

In sum, the CIA's *Glomar* response was warranted as to each category of records sought by the plaintiff in her two FOIA requests.  Accordingly, the CIA is entitled to summary judgment with respect to its comprehensive *Glomar* response to the plaintiff's first and second FOIA requests.[10]

## B.     The State Department's Partial *Glomar* Response

As set out above, the plaintiff's FOIA requests directed to the State Department were materially similar to the requests sent to the CIA.  The State Department, relying upon the 33-page declaration of the Acting Co-Director of the State Department's Office of Information Programs and Services,[11] issued a *Glomar* response with respect to two of the categories of

---

[10]     The plaintiff does not separately address the applicability of Exemption 1 and Exemption 3, conceding that, here, "[t]he same analysis applies to Exemption 3."  Pl.'s Opp'n at 10 n.5.  Having concluded that Exemption 1 justifies the CIA's *Glomar* response in this case, the Court need not consider whether Exemption 3 or various PA exemptions also apply.  *See Mobley v. CIA*, 924 F. Supp. 2d 24, 52 n.20 (D.D.C. 2013) ("Although the plaintiffs also raise objections to the CIA's invocation of FOIA Exemption 3 to justify its *Glomar* response, . . . the Court need not resolve those objections because the Court concludes that the CIA's *Glomar* response was justified independently under FOIA Exemption 1."), *aff'd*, 806 F.3d 568 (D.C. Cir. 2015).

[11]     The State Department's declarant became Director of that Office on January 22, 2017, shortly before he executed his second declaration, which was filed in response to the Court's minute order dated January 12, 2017.

records sought in the plaintiff's first FOIA request to the State Department (categories 1 and 3) and with respect to each category of records sought in the plaintiff's second FOIA request.  First Stein Decl. ¶ 15.  The State Department's declarant explains that "to confirm the existence or nonexistence of records responsive to items one and three of Plaintiff's first request as well as Plaintiff's second request would cause damage to U.S. foreign relations or foreign activities of the United States," and, accordingly, "the existence or nonexistence of [these] requested records is currently and properly classified under E.O. 13526, Section 1.4(b), 1.4(c), and 1.4(d), and is exempt under FOIA Exemption 1 . . . and FOIA Exemption 3."  First Stein Decl. ¶ 15; *see also id.* ¶ 51.  The plaintiff does not challenge the State Department's response to her first FOIA request.[12]  Thus, the only remaining issue with respect to the State Department is its *Glomar* response to the plaintiff's second FOIA request, and this issue need not detain the Court long.

The plaintiff's second FOIA request to the State Department sought six categories of records, including records "constituting or reflecting communications" between State Department officials and Avv. Cagnola and between the CIA and the President of Italy that "mention, discuss, or refer to clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case," as well as any other records "mentioning, discussing, or referring to clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case."  Defs.' SMF ¶ 14.  The plaintiff's second FOIA request also sought records mentioning the plaintiff's July 2, 2014 letter to Avv. Cagnola, discussed above, regarding "clemency for the CIA

---

*See* Declaration of Eric F. Stein, Director of the Office of Information Programs and Services, U.S. State Department ("Second Stein Decl.") ¶ 1, ECF No. 32-2.  The second declaration sets out each *Glomar* fact that would be revealed by responding to each of the plaintiff's discrete requests and also "concur[red] with the concurrently filed public declaration of Antoinette Shiner, . . . which explains in greater detail the reasons why the putative records Plaintiff seeks, in each category, are properly subject to a *Glomar* response."  *Id.* ¶ 7.

[12]      Initially, the plaintiff challenged the State Department's *Glomar* response to "[i]tem 4 in Plaintiff's first FOIA request to State," Pl.'s Opp'n at 11, but dropped the challenge after the State Department reminded the plaintiff that "State did *not* assert a *Glomar* response over part 4 of Plaintiff's first FOIA request; rather, State only asserted a *Glomar* response over parts 1 and 3 of that request," Defs.' Opp'n at 7.

officers (including [the plaintiff]) convicted in the Milan rendition case." *Id.* Finally, the request asked for records "constituting or reflecting communications by or to" Department of State officials "requesting the assistance of Avv. Cagnola" in filing a clemency action "on behalf of the remaining convicted CIA officers," as well as records "constituting or reflecting communications between" the U.S. Embassy and Avv. Cagnola that "mention, discuss, or refer to obtaining approval to proceed on the convicted CIA officers' behalf, payment of Avv. Cagnola['s] fees, or which CIA officers' behalf clemency will be sought." *Id.* (alteration in original). Thus, *every* request propounded to the State Department presumes that at least some individuals convicted in connection with the rendition—including the plaintiff—were affiliated with the CIA. Whether these individuals were affiliated with the CIA is properly classified. *See* First Shiner Decl. ¶ 23; Second Shiner Decl. ¶ 3. Accordingly, the State Department's partial *Glomar* response was warranted, and summary judgment is entered in favor of the State Department.[13]

### C.       The Department of Defense's Withholding of Cole 61-62

The Department of Defense produced 74 documents in response to the plaintiff's FOIA requests, First Herrington Decl. ¶¶ 4–5, but, as set out in its *Vaughn* index, withheld a "draft letter from SECDEF to POTUS regarding DoD assertion of the [Status of Forces Agreement ('SOFA') between the United States and Italy]" ("Cole 61-62") pursuant to FOIA Exemption 5,

---

[13]     The plaintiff argues that her request for communications between the State Department and Avv. Cagnola that "mention, discuss, or refer to clemency for the CIA officers (including [the plaintiff]) convicted in the Milan rendition case," *see* Defs.' SMF ¶ 14, "does not presuppose that those 'CIA officers' participated in the alleged rendition" because "[p]articipating in a rendition, and being convicted of participating in a rendition, are two different things." Pl.'s Reply at 5. Moreover, according to the plaintiff, "describing the convicted individuals as 'CIA officers' does not necessarily imply 'CIA sponsorship' of any actions they may have taken." *Id.* at 5–6. These arguments are not persuasive. Although true that someone could be wrongfully convicted or that a CIA officer conceivably could have participated in the rendition in his or her personal capacity, without CIA sponsorship, reading the plaintiff's requests to cover those possibilities is a stretch, when the plain language instead assumes that those participating in the rendition were CIA employees.

*see* First Herrington Decl., Ex. 1 ("Cole *Vaughn* Index"), ECF No. 22-3.  The letter at issue

addresses the decision whether to "assert[] primary jurisdiction under the SOFA in September

2009" on behalf of Lieutenant Colonel Romano, an officer in the United States Air Force who

was ultimately tried and convicted *in absentia* in connection with the alleged rendition of Abu

Omar, notwithstanding the government's ultimate decision to invoke jurisdiction under the

SOFA.  First Herrington Decl. ¶¶ 5, 13–14; *see also id.* ¶ 17; Second Decl. of Mark H.

Herrington, Associate Deputy General Counsel, Department of Defense ("Second Herrington

Decl.) ¶ 3, ECF No. 27-2.  The plaintiff challenges the Department of Defense's withholding of

the draft letter, Cole 61-62.

  FOIA Exemption 5, on which the Department of Defense relies, protects "inter-agency or

intra-agency memorandums or letters which would not be available by law to a party other than

an agency in litigation with the agency."  5 U.S.C. § 552(b)(5); *see also Judicial Watch, Inc. v.*

*U.S. Dep't of Def.*, 847 F.3d 735, 738–39 (D.C. Cir. 2017) ("Exemption 5 . . .  allows agencies to

withhold information that would in the context of litigation be protected from discovery by a

'recognized evidentiary or discovery privilege.'" (quoting *Pub. Citizen, Inc.*, 598 F.3d at

874)).  "'Among th[e] privileges protected by Exemption 5 is the . . . deliberative process

privilege,'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 739 (quoting *Arthur Andersen &*

*Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982)), "which protects government documents that are

both 'predecisional' and 'deliberative,'" *id.* (quoting *Pub. Citizen, Inc.*, 598 F.3d at 874).

"Documents are 'predecisional' if they are 'generated before the adoption of an agency policy,'

and 'deliberative' if they 'reflect[ ] the give-and-take of the consultative process.'"  *Id.* (quoting

*Pub. Citizen, Inc.*, 598 F.3d at 874) (alteration in original).  The government bears the burden of

showing that the withheld document is both predecisional and deliberative.  *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997).

The Supreme Court has explained that "[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news" and, thus, the privilege's "object is to enhance 'the quality of agency decisions,' . . . by protecting open and frank discussion among those who make them within the Government."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (citations omitted); *see also Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d at 739 ("The deliberative process privilege reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as the strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public.").  Nevertheless, "[i]n keeping with [FOIA's] policy of the fullest responsible disclosure, Congress intended Exemption 5 to be as narrow as is consistent with efficient Government operations."  *FTC v. Grolier, Inc.*, 462 U.S. 19, 23 (1983) (quotation marks, citation, and alterations omitted); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) ("[I]t is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context.").

In support of its withholdings and redactions, the Department of Defense proffered the declarations of its Associate Deputy General Counsel.  The *Vaughn* index appended to the first declaration submitted by the Department of Defense describes the draft letter at issue as part of a collection of  "e-mails, memos, and the like that discuss the legal effects of assertion [of the SOFA], propose timing of assertion, discuss historic use of assertion, and international

ramifications of assertion." First Herrington Decl. ¶ 14.[14]  These documents are further described as "inter- and intra-agency memoranda that contain opinions, advice, and recommendations as part of the consultative process involved in determining United States policy and action," and that "[d]isclosure of this information could chill full, frank and open discussions on matters of policy between subordinates and superiors." *Id.* ¶ 16.

The Department of Defense's declarant specifically addressed the contested letter in a supplemental declaration, stating that the letter is "an unsigned, undated draft letter from the Secretary of Defense to the President declaring an intent and desire to assert the . . . SOFA . . . and providing rationales for the [preferred course of] action." Second Herrington Decl. ¶ 3. To clarify the timing of the challenged letter, the declarant states that it "is most likely the draft letter referenced in an email bates-numbered Cole DoD/OGC 121, which is dated June 11, 2009," several months before the government ultimately asserted jurisdiction under the SOFA in September 2009. *Id.*  On the basis of these declarations, the Department of Defense argues that "the relevant context suggests that the draft letter was in fact sent months prior to the ultimate decision as to whether to assert the Status of Forces Agreement and accordingly can properly be classified as pre-decisional." Defs.' Opp'n at 10.  Furthermore, the Department of Defense contends that "the decision of whether or not to assert the Status of Forces Agreement ultimately lies with the President," and, accordingly, "even if the letter had been final and signed, it would remain a pre-decisional recommendation from a subordinate to a superior." *Id.*

---

[14]     The *Vaughn* index also describes other documents under the label "DeSousa Vaughn Index," as including "e-mails, memos, letters, and the like that discuss the potential of pardon, the process to obtain it, recommendations and requests regarding engagement with the Italian Government, preparations for interagency deliberations, and legal assessments of Col Romano's situation." First Herrington Decl. ¶ 15.  None of the documents listed in this section of the *Vaughn* index is challenged in this suit.

The plaintiff argues that the Department of Defense has failed to make the requisite showing that the withheld letter is predecisional and deliberative.  *See* Pl.'s Opp'n at 12–13; Pl.'s Reply at 7–11.  According to the plaintiff, because the letter is unsigned and undated, it is "impossible to know from the face of the document when it was created and when, if ever, it was sent."  Pl.'s Reply at 7 (referring to second declaration as "speculati[ve]").  In response to the Department of Defense's position that the letter is necessarily predecisional because the President retains authority to override the Secretary's decision to assert the SOFA, the plaintiff contends that what matters for purposes of Exemption 5 analysis is that "the letter represents the final position of the *agency* as to whether SOFA should be asserted."  *Id.* at 8 (emphasis in original) (citing *Tax Analysts*, 117 F.3d at 617); *see also id.* at 9 ("The government's argument that the President's authority to prohibit the assertion of SOFA renders an otherwise final agency decision 'predecisional' proves too much.  As the Commander-in-Chief, the President could prohibit virtually all Defense actions, no matter how final the view of the agency on the matter." (internal quotation marks and citation omitted)).

As for the policy aims underlying the deliberative process privilege, the plaintiff contends that "notification to the President from the Secretary of Defense that the agency intends to invoke SOFA does not represent the kind of 'subjective, personal thoughts on a subject' which would 'subject the writer either to ridicule or criticism.'" *Id.* at 10 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980)).  Further, the plaintiff posits that there "is no reasonable risk that, had the Secretary of Defense known the letter would become public, he would have been less candid in communicating to the President that he had decided to invoke SOFA."  *Id.*  Finally, the plaintiff argues that even if the letter was at one time predecisional, it lost its predecisional status when the course of action proposed in the letter, *i.e.*,

asserting the SOFA on behalf of Lieutenant Colonel Romano, was ultimately adopted by the agency.  *See* Pl.'s Reply at 11 (citing *Coastal States Gas Corp.*, 617 F.2d at 866).  As explained below, the plaintiff's contention that the letter was never predecisional fails.  Her argument that the letter's predecisional character was destroyed when the agency adopted the letter, however, fairs better.

The letter at issue bears all the markings of a predecisional document.  It is a draft letter that describes and rationalizes a proposed course of action among high level officials.  *See* Second Herrington Decl. ¶ 3.  That the letter is undated and unsigned, or that it may never have been sent, is of no moment.  Indeed, common sense dictates that a letter suggesting a proposed course of action would not be drafted or sent *after* the action had already been taken.  If the draft, unsigned letter was never actually sent to the President, a reasonable inference could be drawn that its contents ultimately were rejected or revised, in which case the deliberative process privilege's protections would be at their apex.  *See Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d at 739  ("The privilege . . . avoids confusion from premature disclosure of ideas that are not—or not yet—final policy, and misimpressions from 'dissemination of documents suggesting reasons and rationales' not ultimately relied on." (quoting *Coastal States Gas Corp.*, 617 F.2d at 866)).  Accordingly, the draft letter from the Secretary of Defense to the president was predecisional, at least at the time it was written.[15]

---

[15]    As noted, the Department of Defense argues, in the alternative, that the letter was predecisional because the President could override the Secretary's determination as to whether to assert the SOFA.  Defs.' Opp'n at 10.  The plaintiff disagrees.  Pl.'s Reply at 8–9.  Having already determined that the letter was predecisional when written, the Court need not reach this argument.  Nevertheless, the Court notes that to the extent that the Secretary of Defense and the President were trading letters concerning the appropriate course of action, those letters clearly "'reflect[] the give-and-take of the consultative process.'"  *Judicial Watch, Inc. v. FDA*, 449 F.3d at 151 (quoting *Coastal States Gas Corp.*, 617 F.2d at 866).  This is even truer when the letter was sent from the Secretary to the President.  *See Schlefer v. United States*, 702 F.2d 233, 238 (D.C. Cir. 1983) ("[M]emoranda from 'subordinate' to 'superior' on an agency ladder are likely to be more 'deliberative' in character than documents emanating from superior to subordinate." (quoting *Sears, Roebuck & Co.*, 421 U.S. at 155)); *Taxation With Representation Fund v. IRS*, 646 F.2d 666, 679 (D.C. Cir. 1981) ("A[] . . . factor to be considered in determinations with respect to ... the

The plaintiff argues, however, that "[e]ven if the letter was predecisional at the time it was written, . . . it has since lost that status because the agency has formally asserted SOFA." Pl.'s Reply at 10. The law is well established that "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp.*, 617 F.2d at 866. The D.C. Circuit recently elucidated the standards governing adoption of otherwise predecisional documents. *See generally Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735. In *Judicial Watch*, the plaintiff-organization sought from the Department of Defense, *inter alia*, "any and all Secretary of Defense memos signed on or before May 31, 2014, that approved the release of the five Guantanamo Bay detainees exchanged for Sgt. Bowe Bergdahl." *Id.* at 737. At issue was "a packet prepared by Assistant Secretary of Defense Michael Lumpkin," containing a "cover memo from Mr. Lumpkin to the Secretary of Defense . . . setting forth Mr. Lumpkin's recommendation regarding the Guantanamo Bay detainees, and . . . eight letters to members of Congress [providing notice of the transfer], which Mr. Lumpkin had prepared for the Secretary's signature." *Id.* at 738 (internal quotation marks omitted). The Department of Defense justified the withholding of the Lumpkin Memo on Exemption 5 grounds. *See id.* The plaintiff objected, arguing that the Secretary had adopted the Lumpkin Memo when he signed and sent the eight letters accompanying the Memo to members of Congress. *See id.* at 739. Relying on the agency's declaration, which provided that "the

---

deliberative process privilege is the nature of the decisionmaking authority vested in the office or person issuing the disputed document."); *see also Judicial Watch, Inc. v. U.S. Dep't of Justice*, 20 F. Supp. 3d 260, 271 (D.D.C. 2014) ("Even if the relationship between the author and recipient of challenged records is not one of subordinate and superior officials, when the role of the author is as an advice-giver rather than a decision-maker, this militates in favor of the document qualifying as part of the deliberative process."). This analysis is unaltered by the fact that the letter's intended or actual recipient was the President. *See Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131 (D.C. Cir. 2005) ("That the President, rather than an agency, initiated the policy development process is of no moment; what matters is whether a document will expose the pre-decisional and deliberative processes *of the Executive Branch*." (emphasis added)).

Secretary did not sign or endorse the Lumpkin Memo, nor send the memo to Congress," *id.* at

738, the Court ultimately held that the Secretary had not adopted the Memo, *id.* at 739–40 ("The

only reasoning that the Secretary of Defense held out as his own was the reasoning in the

congressional letters.").

Thus, the relevant declaration in *Judicial Watch* made clear that the Secretary of Defense

had not relied on the Lumpkin Memo in explaining to Congress why the detainees had been

transferred.  By contrast, the second declaration in the instant case—by the same declarant whose

averments were relied upon in *Judicial Watch*—makes no such affirmative statement about the

lack of reliance by the decisionmaker on the challenged document here.  Instead, the second

declaration indicates that the United States government ultimately adopted the course of action

set out in the letter, which was written by someone in the Secretary's office, apparently close in

time to the decision to invoke the SOFA.  *See* Second Herrington Decl. ¶ 3 ("The document was

a[] . . . letter from the Secretary of Defense to the President declaring an intent and desire to

assert the the [sic] Status of Forces Agreement . . . between the United States and

Italy[.] . . .  [T]he assertion of the SOFA was . . . made [in] September 2009.").  The relevant

declarations are otherwise silent about key considerations for application of the deliverative

process privilege, including by failing to specify the process by which the United States

government asserted primary jurisdiction under the SOFA, leaving the Court to imagine what

role the letter and its rationale might have played in that process.  The Department of Defense

must explain whether the official who ultimately invoked jurisdiction under the SOFA relied on

the reasoning set out in the letter from the Secretary of Defense to the President.  If so, the letter

has lost its predecisional character, and the Department of Defense has not properly relied on

Exemption 5.

To be clear, "vague or equivocal statements implying that a position presented in a deliberative document has merit" do not amount to adoption. *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d at 739. Instead, adoption requires that an agency "make an '*express*[ ]' choice to use a deliberative document as a source of agency guidance." *Id.* (quoting *Sears, Roebuck & Co.*, 421 U.S. at 161) (emphasis and alteration in original); *see also Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184–85 (1975) ("[B]ecause the evidence utterly fails to support the conclusion that the reasoning in the reports is adopted by the Board as its reasoning, even when it agrees with the conclusion of a report, we conclude that the reports are not final opinions and do fall within Exemption 5."); *Afshar v. Dep't of State*, 702 F.2d 1125, 1142 (D.C. Cir. 1983) ("To the extent the reasoning of the recommendations is expressly adopted, there is no longer any need to protect the consultative process."); *Nat'l Council of La Raza v. U.S. Dep't of Justice*, 411 F.3d 350, 358 (2d Cir. 2005) ("[H]ad the Department simply adopted only the conclusions of the OLC Memorandum, the district court could not have required that the Memorandum be disclosed. Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). On this record, however, the Court is unable to determine whether the Department of Defense "ma[de] an express choice to use a deliberative document," *i.e.*, the letter, "as a source of agency guidance." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d at 739 (internal quotation marks and emphasis omitted). Accordingly, this action is remanded to the agency so that it may supplement the record with additional information concerning the withholding. Both the plaintiff's and the government's motion for summary judgment are denied without prejudice as to the issue whether the draft letter from the Secretary of Defense to the President was adopted by the agency.

### D.        Segregation of Non-Exempt Material

The plaintiff's fourth and final argument is that "[t]he declarants for both State and Department of Defense address segregability only with a conclusory legal statement, and the respective Vaughn indices do not indicate why deliberative material could not be segregated from factual material."  Pl.'s Opp'n at 13.  The State Department and Department of Defense argue that, "[f]ar from issuing merely a 'conclusory legal statement,' both State and DoD explained that they reviewed responsive documents on a line-by-line basis and concluded that it is impossible to further segregate and release purely factual material from these documents without disclosing the pre-decisional and deliberative communications of the documents' authors, privileged attorney-client communications, or attorney work product."  Defs.' Opp'n at 10 (citing First Stein Decl. ¶ 76; First Herrington Decl. ¶ 25).

"The FOIA requires that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Morley*, 508 F.3d at 1123 (alteration in original) (citing 5 U.S.C. § 552(b)).  To satisfy its segregability obligation, "[an] agency must provide a 'detailed justification' for . . . non-segregability," but "is not required to provide so much detail that the exempt material would be effectively disclosed."  *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)).  That said, it is by now firmly engrained that an agency may provide sufficient justification by describing the materials withheld, the exemption under which they were withheld, and an affidavit attesting that "it released all segregable material."  *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are

"sufficient for [the segregability] determination"); *Johnson*, 310 F.3d at 776.  Accordingly, the

State Department and Department of Defense met their segregability burdens by submitting

*Vaughn* indexes, in combination with the attestations of their respective declarants that

documents were reviewed "on a line-by-line basis" and no further segregation would be possible.

*See Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d 1, 13 (D.D.C. 2014)

("The reviewing court may rely on the description of the withheld records set forth in the

Vaughn index and the agency's declaration that it released all segregable information.");

*Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 517–18 (D.D.C. 2015) (same).

## IV.   CONCLUSION

For the foregoing reasons, the CIA and State Department are entitled to summary

judgment as to their respective *Glomar* responses, and the State Department and Department of

Defense are entitled to summary judgment as to whether all segregable information was properly

released.  Summary judgment as to the Department of Defense's withholding of Cole 61-62 is

denied, without prejudice, so that this agency may reevaluate the withholding or adequately

explain the predecisional nature of the document warranting withholding under Exemption 5.

The parties shall confer and submit, by March 31, 2017, a proposed schedule to govern further

proceedings in this matter.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 9, 2017

_____
BERYL A. HOWELL
Chief Judge